We'll hear argument first this morning in Case 15-1194, Packingham v. North Carolina. Mr. Goldberg. Mr. Chief Justice, and may it please the Court, there are three principal features of North Carolina's law that make it a stark abridgment of the freedom of speech. First, Section 202.5 reaches vast swaths of core First Amendment activity that is totally unrelated to the government's preventative purpose. Mr. Packingham was not accused of communicating with or viewing the profile of a minor. He violated Section 202.5 by speaking to his friends and family about his experience in traffic court. And if today he were to view or respond to any of the thousands of Twitter messages about his case in this court, that would be a felony. Second, the law does not operate in some sleepy First Amendment corner. It operates and forbids speech on the very platforms on which Americans today are most likely to communicate, to organize for social change, and to petition their government. Third, Section 202.5 Please go ahead. Please go ahead. Is a criminal law, Your Honor, that imposes punishment for protected First Amendment activity without any regard to individual culpability or lack of culpability. Could a State impose this restriction as a condition of parole? Your Honor, I think they have much more authority to impose things as a condition of parole. And States do this all the time. And they limit people's First Amendment rights. I think that they, if you had something that was as sweeping as this for life, for anybody who had committed a sex offense, I don't think they could do that. But sex offense. Justice Ginsburg. The most fundamental right is taken away from ex-fundamentals by some States, prohibit ex-felons from voting. Some States and the Federal government prohibits keeping and bearing arms. Those are constitutional rights. Right, Your Honor. So both of those rights are different from the First Amendment. They're equally fundamental, but they are different. So in the case of voting, North Carolina does not take away. North Carolina draws the line at people who have completed their parole, their period of supervised release. But in Richardson v. Ramirez, the Court looked to the text and history and tradition and said in Section 2 of the 14th Amendment, there was affirmative sanction for felon disenfranchisement. If you look at that same section, which dealt with the people who were rebelled in the Civil War, you didn't need to restore their First Amendment rights. And with the Second Amendment, when somebody is convicted of a crime, they immediately lose their Second Amendment rights. They don't lose their First Amendment rights. So in the Simon and Schuster case, this Court vindicated the rights of somebody who was a serial killer who wanted to write from prison where he was serving a life sentence for murder about his experience. So it's a little difficult to tell. You said look at the text and history. We don't have a lot of history here concerning access to websites and all the sort of things we're dealing with here. So I don't think that's a very useful guide. I agree, Your Honor. But I think when you look at, when we talk about the history, the history is there isn't a tradition or a history of taking away people's First Amendment rights. When the Court said First Amendment rights are inalienable, it had meaning. My point is, though, you don't have a lot of history of having such sites or access where they can provide broad access to minors of the sort that is problematic with respect to this individual. I don't disagree with you. We know, as with violent video games, as with any manner of new technologies that the Court has confronted, there isn't a framing era or reconstruction era analog. But there is no history when you talk about all of the things that the state historically has restricted. They've never said you lose your right to publish a newspaper because you've been convicted. Suppose we try to translate this into terms that would be familiar at the time of the adoption of the First Amendment. So suppose the state enacted a law prohibiting anyone convicted of kidnapping children from visiting a nursery school. Would that be a violation of the First Amendment? I don't think so, Your Honor. Obviously, at the framing, the First Amendment didn't apply to the states. But the uh, All right, suppose it was in the District of Columbia. So, Your Honor, a kindergarten, first of all, I don't know that there's a First Amendment right to visit a kindergarten. And that's fundamental here. This law only applies in the places where everything that happens is a First Amendment activity, whether it's receiving information, speaking, associating, petitioning. When some Suppose the law simply said that someone who was a sex offender could not communicate with a minor on social media. Would you agree that that would be constitutional? Well, I think my first answer is that it would be much less restrictive, and that shows why this law is unconstitutional, right? And that's exactly what the prosecutor, if you look at a There's a concern here for the safety of children. So I'm asking you, yes, of course, it's less restrictive. Would it be constitutional to say no communication with a minor? So I think it probably would be, Your Honor. I think that the difference here is if you take the test, the narrow tailoring test, which is fundamentally a, this Court had said in Ward, a quantitative test. And you say, what percentage of what you suppress implicates the interest? When you're talking about communicating with minors or viewing the pages of minors, that is going to the heartland of the protective interest that the state is asserting. But here, everything that they're suppressing, as we've said, it's indifferent as to whether it's a good or a poor speech. Obviously, Petitioner was convicted for saying, thank you, Jesus, God is good, about a parking ticket to an audience. But you think that even as narrowly tailored as Justice Ginsburg's example, so it would be a crime for a convicted sex offender, or let's say someone who was convicted previously of committing a sex offense using the internet from contacting on the internet a person who is known by that person to be a minor without the consent of the parents of the minor, that would be a violation of the First Amendment? No. I said I think that would be constitutional, Your Honor. Oh, I thought you said it wouldn't. I'm sorry, if I wasn't clear about that. I would still say that there are narrow tailoring questions. I'm not here to say that particular hypothetical law. They're one of the concerns with this law that I think you've handled by narrowing it to a subset of people. This applies to everybody on the registry, and it applies essentially on a statistical basis on the theory that as a collective, they have a higher rate of recidivism than people on average. And I think this Court's First Amendment cases say that's a very problematic assumption to just be, and especially with a population like this that is so heterogeneous and that is constantly being evaluated on an individualized basis, it's not clear to me why you would take people's First Amendment rights away for life if the theory could be. Sotomayor, what do you think your best argument is? Is this statute too overbroad? Does it fail scrutiny, whatever level we adopt? What's the – what do you think – I know you say all of those things. Yes, all of the above, Your Honor, and this is not a case where the level of scrutiny is going to make a difference. Elizabeth Browning, let me count the ways. Exactly, Your Honor. But let me ask you, suppose there were an app, a program in which officers could monitor your video and your cyber equipment and disclose if you are communicating with minors. Could that be a law that every convicted person has to consent to that app and to that surveillance? Well, I think that goes to the question of, which you don't need to answer, and I want to answer Justice Sotomayor's question as well, in this case, what does the status of being a registrant mean in terms of somebody's constitutional rights? I think that is clearly a much less restrictive from a First Amendment perspective because then, again, people like Mr. Packingham, anybody who wants to do the things that are harmless and fully protected is able to do it, people have not, and it is effective detection and deterrence. So from a First Amendment perspective, that's a home run. There is a Fourth Amendment question there, which is ordinarily once you're done with supervised release, you have full ---- First Amendment for the home run?  I'm saying for the State, Your Honor. I think it does everything. It's perfectly tailored in a certain sense, except for the State has a sense of what you may be up to, which is a concern, but essentially, they're able to deter people, detect people, and the people who want to speak and exercise their core First Amendment rights have no problem whatsoever. I take it, Mr. Goldberg, that part of what the State is saying here is that it doesn't have the capacity to do that. It doesn't have the capacity to do it message by message or click by click, what a person is doing, and in the absence of that, that some kind of prophylactic remedy is needed. And that's not unheard of in First Amendment law. I mean, if you think of a case like Burson, which is the 50 feet with the polling places, that's kind of a prophylactic rule. So why wouldn't the same be appropriate here? Well, Your Honor, we – obviously, there are times when prophylactic rules are permissible under the First Amendment. Mr. Packingham, when he was convicted, got a condition that said you shall not have any contact with the specific victim of this crime. That would otherwise, if that were applied to you or me, that would be an abridgment of our freedom of speech. So there's no general rule. The Court has said repeatedly that you should be suspicious of prophylactic rules because ordinarily, you don't want to – you want to allow people to speak. But even as we've been talking about rules like – that are focused on teenagers on the internet and having specific contact with them, those are prophylactic rules too. So I don't think it's – the question is, can you do it at the first step? And I think – But what is – what was your answer, which I forgot? A statute prohibits a convicted sex offender from being – spending more than 5 minutes at a children's playground. Is that constitutional or not? I think that's constitutional because it – All right. I don't – That's constitutional. Instead of what most of the briefs do is interpret the statute as broadly as possible.  What about trying to interpret it as narrowly as possible? And as narrowly as possible, it seems to be a necessary condition. Is it a violator cannot go to a site that facilitates the social introduction between two or more persons – and these are children they're talking about, I guess – or two or more persons for the purposes of friendship, meeting other persons, or information exchanges? So we have to say, or related information exchanges. And now we have a definition that sounds as if they're talking about dating sites, or it sounds as if they're talking about related playgroup sites if you take younger children. And is it possible to read it that way? And if you do read it that way, is it constitutional? Well, Your Honor, a couple points. The first answer to the playground, we don't – I think you start with what is the First Amendment right that is being abridged. I'm not sure that I see a First Amendment right being abridged. But I wanted to be – I wanted to get your answer, and I think I have that. And I'm really interested in the narrow possibility of interpreting it narrowly, as I said. And on that basis, it's facially constitutional, though it could be applied unconstitutionally. That's what I want your answer to. So, Your Honor, this is a criminal case. It doesn't arise as a civil suit in district court. This is first and foremost an as-applied challenge because the relief that we're seeking is to overturn the condition. You're not attacking the statute. You're only attacking it applied to your client? In a criminal case, you – the court has the power to say, and I think it's appropriate in this case, that this – the problem here is the problem for every application. And that's what we've argued. Okay. That's – then we're back to my question. So I'm treating it as an as-applied challenge. I don't want to just repeat the question. Right. I want to get your answer to the question.  So the answer is, Your Honor, that this – that narrow construction, I'm not sure that that's possible. And that narrow construction isn't going to be, in this case, make any difference because, as I understand your hypothetical statute or construction, that is not – Mr. Packingham did not violate the law, but we have wronged him. But don't you see what I'm – all I'm doing is reading one word before information exchange, and the word I'm reading is related information exchange. And as so interpreted, that Clause 2, which you're much more familiar with than I am, seems to be talking about dating sites or the lower age-level equivalent. I don't think that's what it says facilitates the social introduction. Between two or more persons for the purposes of friendship, meeting other persons, or related information exchanges. I've now got a social dating or equivalent site. Right. I think I can say that. Now, if I say that, is it constitutional? That's what I'm trying to get your answer to. If it were limited to dating sites, I'm assuming that it is constitutional, Your Honor. I don't think the State has ever said that this is about dating sites. They say there's a category of – Well, they couldn't because of your case. Right, exactly. Your case involved boasting about getting off of traffic. Right. So that's – that is my first and most important point, that Mr. Packham was not on a dating site. So then the answer to this would be they have not applied it that way here, and given the way they've applied it here, they can't do that. I don't – Then we're going to have 40 other cases. I don't think they've ever applied it. I think the main focus – dating sites tend to have age restrictions that go – apply only to adults, and so I think it's their position that those are excluded from this. Their – I think the State's position, and you can hear from them, they've never proposed that as a construction because they want to go after these – these sites, the classic social networking sites. Yeah. The interpretation that Justice Breyer – the language that Justice Breyer is referring to, and other language in the statute, I think could, for the purpose of avoiding First Amendment problems, be limited to core social networking sites, including Facebook and things like Facebook, Google Plus, that sort of thing, and excluding a lot of the other sites that the Electronic Frontier says are included, like The New York Times and Betty Crocker and things like that. So it would be limited just to social networking sites. Would you agree that it could be read – using constitutional avoidance, it could be narrowed to at least those? So honestly, Your Honor, I'm not sure that it can, but it's very important for the constitutional question that that is irrelevant. And this goes back to Justice Sotomayor's question, which was what is – how do we win this case? What is the ground – what is the biggest problem with the statute? And the biggest problem with the statute – Alito, just to put it in context, it is important for purposes of an as-applied challenge, because if – what your client used was a social – was Facebook, right? Right. Okay. So – So even if it were limited to those, you would say it's constitutional? Right. Our position, and for the very reason we've talked about, which is that this, just like the law in the Jews for Jesus Airport case from Los Angeles that said no First Amendment activity, and it says it indiscriminate itself. Counsel, I mean, one of my problems with all of these sites today is that none of them are purely – or very few of them are purely anything anymore. Well – Take something like Lincoln, which many, many people in our society today are looking for jobs there, but high school students are permitted to look for jobs and to post their data, personal data, on that site. So is that traditional social media or not? We're – Well, I think the State says that it is because it meets the definition. I just want to get back to Justice Alito's question. Well, but that's my point, which is Facebook, many people, many businesses are using it for commercial advertising. Right. And that's very true. And there was another defendant who was prosecuted alongside Mr. Packingham who was an IT person, Mr. Christian Johnson, and he lost his job because his employer said it's impossible for you to do your job if you can't get on these sites. So – Even if you don't talk about it – Well, all of these questions implicate what Justice Sotomayor asked earlier, and then I and others interrupted you. What is the category that we use? If we rule for you, we say this statute is a violation of the First Amendment because What are the basic rules or the basic doctrinal choices you offer us to say why this is unconstitutional? Sure. So the most straightforward basic doctrinal basis to say it's not narrowly tailored and stop there, or overbroad, which is the flip side. Sometimes overbroad is a confusing word because it has this third-party standing dimension. In the airport case, it was used to say this goes way too far because it prohibits lots of First Amendment speech. So if you just take the Ward narrow tailoring test or you take the test in Frisbee and Taxpayers v. Vincent where you say, does this – is the theory of this law that it restricts speech on the possibility that that will lead to some other harm, that inherently is not going to be a narrowly tailored law. Or you can look at it the way Ward did, which said, let's look at how much of protected activity is suppressed, how much of that implicates this purpose. And again, that's a really straightforward way. Now we think, and our brief argues, that there are multiple prongs. If you go through every prong of the Ward analysis, this is a really stark case in terms of alternative channels. This forecloses, as I said, some of the most important channels of communication in our society. So you could do that. You could say that, too. But what the Court said in McClellan is once you get – if it's not narrowly tailored, that then it's unconstitutional. And I don't see – JUSTICE ROBERTS – Well, one of the – I mean, under narrow tailoring, I think it's incumbent upon you to come up with a narrow – more narrowly tailored alternative. So if you wanted to – you're in the North Carolina legislature and you're told you can't do this, what would you do as the most effective alternative? MR. CLEMENT – Well, Your Honor, I think the opinion in McClellan said it was not incumbent on the challenger to come up with the alternative. But here it said the State has to show that it seriously considered alternatives. But – JUSTICE GINSBURG – I thought you agreed with me earlier that North Carolina could ban communicating with a minor via social media.  CLEMENT – Right. Right. So I think that is – JUSTICE BREYER – Well, I guess the response to that is, well, how do you know that it's a minor? Or how is the – I mean, I assume that minors can put on – they don't have to have their age in their email. They don't have to communicate it in the text of the message that's put on the site. So I think the response might be that that's not terribly effective. CLEMENT – So two answers to that. First of all, if you look at page 11 of the blue brief, where there is the closing argument by the DA in this case, the DA lays out what – again, this is not a case where we've come up with some exotic theory about how you could narrow this law. And the DA says to the jury, in order to convict, you might not like this law, you might prefer a law that says don't have specific contact on Facebook with minor children, or a law that says don't say specific things that might entrap teenagers, and this law doesn't say that. It doesn't. But even if you don't agree with it, if you don't like it, the law says he can't access. So to that – JUSTICE ROBERTS – Well, maybe it doesn't say it because it wouldn't work. He doesn't say that the law would be perfectly fine. He says here's an alternative you might like. Maybe the legislature didn't enact it because it made the – concluded that it wouldn't  MR. CLEMENT – Well, Your Honor, I think it would be effective or ineffective exactly the same way this law is effective or ineffective. This – the premise, one of the things that the State argues about effectiveness is that this law will prevent people from doing something. The only way it prevents people is by punishing them and deterring them. It doesn't enable the State to fine people. And as Justice Kennedy was asking about monitoring, that's a way that you can actually detect what people are up to. The nature of this law is that it finds – it's most likely to find the people who are doing nothing wrong, who have – are doing innocent things. And if you envision this subcategory of predators who are using the – these sites, they – and lurking on these sites, they are going to do their very best to hide their identity. SOTOMAYOR – Mr. Goldberg, why was your client using an alias? CLEMENT – I don't think – SOTOMAYOR – If he wasn't lurking or otherwise trying to stay hidden. CLEMENT – So, Your Honor, he wasn't lurking. I don't think there's any basis for saying he was lurking because they then looked at his hard drive. They got the information from Facebook. There are crimes that they could have charged him with. And presumably, if he was doing something that was a serious violation involving teenagers, he would have been prosecuted for something like that. So the alias that he was using was – and I'll put that in scare quotes – was his name that he goes by and his middle name. And his page had his picture and he had a public profile that linked to his father, whose name is Lester G. Packingham, Sr. And so the officer in this case was able to find him in about two seconds. And obviously, he was posting publicly about something that is about religion and his experience in court. SOTOMAYOR – Go back to Justice Kennedy's question, if you would, which is, is there  a way for the State to be able to track whether or not a potential defendant is actually in communication with a minor? JOHNSON – Well, two things, Your Honor. This statute, the State's description of the statute has always – they already have a law about communicating using the Internet with a minor. So they already – that's a different law. Their theory of this case is about the power to gather information. The second thing is that people's ages are verified by Facebook. And in a prosecution, if the assumption was that the person was younger than 18, they would then be able to verify that by getting the record and finding out. If the Court has no further questions, I'd like to reserve the balance of my time. Thank you, counsel. Mr. Montgomery. MONTGOMERY – Mr. Chief Justice, and may it please the Court. For many years, North Carolina, like other States, had laws prohibiting sex offenders from being at physical places where children congregate, schools, playgrounds, daycares, and parks. In 2008, North Carolina decided to prohibit sex offenders from being at virtual places where children congregate online, specifically commercial social networking websites. North Carolina passed Section 202.5 to cover the people most likely to sexually assault children. Unlike some of the other alternatives – or unlike the alternatives proposed, this law is enforceable and effective. One of the things that was said earlier— Social networking, it includes Facebook, obviously. It includes LinkedIn. It includes Twitter. Is that right? That would be correct. So a person in this situation, for example, cannot go onto the President's Twitter accounts to find out what the President is saying today? That's correct. It's not only the President. We're sort of aware of it because the President now uses Twitter. But in fact, everybody uses Twitter. All 50 governors, all 100 senators, every member of the House has a Twitter account. So this has become a crucially important channel of political communication. And a person couldn't go onto those sites and find out what these members of our government are thinking or saying or doing. Is that right? That's right. However, there are alternatives. Usually those congressmen also have their own web page. As far as Twitter— Well, it seems to me, I don't know if we ever did have a public square, but assuming we had a public square 100 years ago, could you say that this person couldn't go into the public square? The sites that Justice Kagan has described and their utility and the extent of their coverage are greater than the communication you could ever had even in the paradigm public square. In essence, states have said that sex offenders can't go into the public square, that they can't go into parks or they can't go near playgrounds. Maybe those have the same problem. I mean, why are we trying to limit that? People all the time want to speak to 18-year-olds, 17-year-olds. It doesn't limit this even to those who have sex problems with children. All right? This is everybody who's ever had a sex offense, and you're not — I take it you're rejecting any effort that I might have hypothetically made to narrow the statute, and you're saying, hey, nowhere. Nowhere, really, because children are everywhere. And what is the difference? I want to go to a park and I want to talk to 16-year-olds about helping get some petition drives. You know, I can make endless examples. So what's the basis here? The State has a reason? Yeah, it does. Does it limit free speech? Dramatically. Are there other, less restrictive ways of doing it? We're not sure, but we think probably, as you've mentioned, some. Okay. End of case, right? No, our position is there are not any enforceable, least restrictive ways for this particular interest that the State has. What about all the ways you just listed, that they have all the statutes which say you can't approach children and say certain things? You remember you started that way. Certainly. And those are the — that's in the physical world, that they can't be approached. What's the difference? Well, there really is no big difference, and that's why in the virtual world, they shouldn't be allowed to approach either. And the fact is, the Department of Justice has reported that there's a 50 to 60 percent crossover from adult victim rapists to children. So all of them, no matter what — who the victim was, are capable of offending against children. So that's why it would apply to everyone. Are you able to find out from the site operators, from Facebook, who one of the registered offenders is communicating with? There may be some instances in which that would happen, but most of these sites have an instant messenger feature or some kind of messenger feature which doesn't show up. In other words, a police officer couldn't go to the website and just look at it and necessarily know who was being communicated with. I thought that Facebook didn't allow — didn't allow access by former sex offenders. That's correct, Justice Ginsburg. There is a prohibition on Facebook and on some of the other major commercial sites. But that's Facebook's choice. It's not the State. That's correct. And certainly the State has implemented this law to be a deterrent so that these offenders will not go on Facebook, whereas the deterrent effect of Facebook having the policy is not the same thing. So the State has made a decision, particularly in the area of information gathering, because these offenders can go to these sites and can quietly lurk and find out information. And there are links. The crucial factor that the State believes that narrows the statute is that the site must have links to other users, profile pages. But, I mean, yes, that narrows it. It takes the NewYorkTimes.com out of the statute. But it doesn't take the sites that people use today, as I suggested, whether it's Twitter or whether it's Facebook, which have become incredibly important parts of our religious culture. If you ask, there are surveys that say how many Americans have communicated their faith on social networking sites in the past week. And it turns out that one in five, that's about 50 million Americans, use this for religious community purposes. So whether it's political community, whether it's religious community, I mean, these sites have become embedded in our culture as ways to communicate and ways to There are other alternatives still. This is a part of the Internet. But it's not the entire Internet that is being taken away from these offenders. They can still have their own blog. They can read blogs. They can do podcasts. They can go to NewYorkTimes.com. They can do other things to communicate with people. This does not prohibit sites that have discreetly just email or instant messenger or message boards. So there are other alternatives. And one point to make also about what the petitioner did in this case, he was arrested for accessing Facebook, not for what he wrote on Facebook. So he did post something on Facebook, but this law prevented him from accessing Facebook. But you're not making a conduct speech distinction, are you? I thought you had dropped that in your briefs. No, no, that's correct, Your Honor. Although the North Carolina Supreme Court certainly recognized that there was a conduct component to this, just like going to a park or going to a playground. But it is speech. That's correct. But the fact that he made a religious statement, it wasn't specifically because of that that he was arrested and charged and convicted for this offense. But, yes, it is speech that is implicated. How was he apprehended? The officer went to his own Facebook account and had a list of sex offenders that he was searching for using their names or aliases or family members. And he was able to find Mr. Packingham's father and then was able to see Mr. Packingham, even though he was using an alias, was able to see his picture and know that it was him. And he was on the list of sex offenders. So that's the way that he did this. He apparently found six others or so in this session that were sex offenders on Facebook. Can you have a statute that says convicted swindlers cannot go on Facebook or cannot go on the Internet on sites that tell people where to gather to discuss money? I'm not sure about that. I can multiply these examples. Convicted, we can think of, pretty soon you're going to have everybody convicted of different things not being able to go anywhere and discuss anything. I exaggerate. Let's just stick with the we can't have convicted swindlers going on Facebook to discuss money. Well, swindlers are not sex offenders. Does that make a difference? Yes, it does make a difference. Sex offenders have been, there have been civil disabilities applied to sex offenders and to other felons. But certainly to sex offenders, such as the registry itself, as this court in Smith v. Doe said that the registry was constitutional. And lower courts have found that the restrictions on going to parks or playgrounds and those sorts of places are also constitutional. These are some of the worst criminals who have abused children and others and committed sex offenses. And this court has recognized that they have a high rate of recidivism and are very likely to do this again. Even as late as 20 years from when they are released, they may recidivate. Mr. Montgomery, can I ask you a question that has to do with the law's exemptions? Because it just confused me when I was reading it. It seems that some of what's exempted by the law seems, I have to say, some of the most dangerous stuff. So you exempt any website that provides only a chat room or only photo sharing? So why is that? Because if I would have said, like, where the most dangerous activity takes place, it's in chat rooms and via photo sharing. Montgomery, The legislature in North Carolina wanted to have some narrow tailoring to this statute. So the fact that it eliminates or exempts some of those things is really a virtue, not a vice. Those are pure forms of communication. Yes? Kagan. It just seems to exempt the stuff that's most easily used to do exactly the things that this statute is meant to prevent. Well, this statute is meant to prevent, at its core, harvesting of information anonymously, which is not something you find as much when you're talking about chat rooms or e-mail or those sorts of things. Typically, there's not the transparent amount of information or the anonymity that comes with the social networking website in which you can click on a link and go find out information about someone that you don't know. Could North Carolina bar those as well, bar the photo sharing and the chat room? The problem then may be that it would not be as narrowly tailored as it should be. That would be the case. And what did you mean in your brief when you said that North Carolina can proceed one step at a time, that it could take further steps consistent with constitutional consideration? Well, certainly there are other steps that may be taken, and perhaps that would be one. But at this point, the ---- But what did you mean in your brief when you said North Carolina could take other steps, additional steps? There are certainly other laws that could be put in place to try to prevent sex offenders from finding out information. When you just said to Justice Ginsburg, well, maybe that would be unconstitutional if they included these things that are instead exempted, so you mean that there's a constitutional right to use Snapchat, but not to use Twitter? I'm not sure I understand that Snapchat and Twitter seem to be included under the statute. Well, I would have thought that Snapchat is ---- maybe I have it wrong. I'm not any expert on this, but isn't Snapchat photo sharing? I believe that is some of it. I don't understand. Yes, so that falls under the exemption, right? So you can use Snapchat, but you can't use Twitter? Well, Snapchat, as I understand it, you don't get the level of information that you get from something else, because Twitter is you can find out much more information than you could from however many seconds of video or pictures or whatever you get with Snapchat. So I think it's a ---- it was a decision to go for the sites in which the most anonymous information could be collected by an offender. And that offender then would use that to groom the child or otherwise use that information to go meet the child and begin a relationship so that the child would be ---- When you ---- the case books are filled with cases where to allow certain groups of people to speak is actually dangerous. Like the communists under, you know, years ago, they said it was a good idea to have a revolution. And all kinds of people have said dangerous things. Here you take a group of people who have done something wrong, been fully punished, and you are saying that they might say something to somebody which would be dangerous. And you're right. It might be. On the other hand, your remedy from that is to cut off their speech. I suspect my law clerks in the space of half an hour would find many cases that put at the level of generality I've just put out, say it is Hornbook law that you can't. You can't unless there is at least a clear and present danger, you know, Holmes, there are lots of qualifications. So why don't you tell me when my law clerks are going to look all these up, and I think I have a few in mind, what case we should look up to be sure we get the opposite, which is what you're arguing, I think. This case is much more like Burson v. Freeman, in which this court said that this 100-foot buffer zone, that a campaign-free zone at a voting place was permissible. And that was suppressing political speech. I think that does not help you at all. That was number one, it was applied to everyone. It was 100 yards. You could have all the political speech in the world outside the, was it 100 yards or 100 feet, whatever it was. It seems to me that that, do you have any better case than that? If you cite Burson, I think you lose. The reason that that case is the one that I mentioned is because the rationale for that was that these kinds of crimes that happen in that zone often go undetected. Unreported.  Kagan. Mr. Montgomery, I agree with you. That's your closest case. It's the one that I asked Mr. Goldberg about, because it's the only case that I know of where we've permitted a prophylactic rule, where we've said not all conduct will have these dangerous effects, but we don't exactly know how to separate out the dangerous, dangerous speech from the not dangerous speech. So we're going to have a prophylactic rule. That is like one out of a zillion First Amendment cases that we've decided in our history. And as Justice Kennedy says, there are many reasons to think it's distinguishable from this one. Well, the fact that it applied to all in Burson, I believe, makes our case a better case, because it doesn't apply to all. It applies to sex offenders who have committed crimes, who have shown that they cannot conform to the law, and are likely to be recidivists. So the fact that it's a narrower group is not — does not make it more problematic, but makes it — makes it better than Burson. Well, that wasn't — that was not the rationale of Burson v. Freeman. Under that rationale, you could have said that it applies only to members of a political party, and it would have been narrower. That would make it worse. The Petitioner here is saying, you are signaling me out and saying that I can't have the First Amendment rights that everybody else did. That's exactly the opposite of what was happening in Burson. But it wouldn't be like signaling out a political party. These are people who have committed sex offenses. So, again, they have had certain disabilities already, civil disabilities. And this Court has certainly said that felons can be prevented from having guns, and felons can be prevented from voting. Here is a situation in which you have sex offenders who have committed heinous crimes and are likely to recidivize. Roberts. Roberts. Is a provision like this ever added to sentences as opposed to following from the sex registry? As part of probation, there can be certainly those sorts of provisions added for the length of parole, for instance, or probation. They can be a condition. A lot of times, those are completely banning the Internet altogether. And one of the things about that is that when somebody is on probation or parole, of course, they usually will consent to having searches done. So it's a lot easier for a parole officer to determine whether this person has five computers or a smartphone or what they're using during that period, unlike the It's hard to generalize, but do you have any idea what the period of parole or probation is for someone who commits a sex offense, such as the one at issue here? I am not sure. I think it's a — I'm thinking that it's around three years, but I'm not positive on that, yes. Not if it's a Federal crime? Not if it was — It's much longer. If it was a Federal crime, it would be much longer. Sotomayor, I'm still having some difficulty, because you're building layer upon layer of speculation or statistical inference. Yes, there's a high statistical inference that recidivism will follow with one sexual crime to another, but then what's the statistical inference I have to draw that people who have abused a neighbor's child but never used the Internet will now use the Internet to abuse a different child? Because this rule is not being applied to just people who have been found to have enticed a child on Facebook or some form of Internet usage. It's being applied indiscriminately to people who have committed a sexual crime of statutory rape or even if they're teenagers, but more than four years apart or something else of that nature. What's the inference that every sexual offender is going to use the Internet to lure a child? Well, it's often impossible to know whether the sex offenders use the Internet or not. Unless they contacted the victim online, it may be impossible to know whether they use the Internet. And certainly as far as recidivism, you don't know how many actual offenses these sex offenders have committed. When they have been in rehabilitation and said that they committed, only about 5 percent of what was reported is what came out when they took a polygraph. So there's much more crime committed by these offenders than ever gets reported. So the fact is that they could have used the Internet for any of their crimes. It may be impossible to know if they use the Internet for their crimes. Some you would know, but many you would not know. But that might be true of every criminal today. That could. Planning or committing almost any crime. That could be, but again, we're talking about social and … If they go to Facebook and find the location of the bank they want to rob, they can go on the Internet and find out who's employed there. The Internet could be used for almost any crime. Correct. For anyone. Those are even more speculative as to how many people would use that. Here we know from studies that about 82 percent of online sex crimes against children, social networking websites were used to gain information about their likes and dislikes. And 62 percent of online sex crimes use social networking websites to gain home and school information. So we know that there's a very high percentage of these offenders who are using social networking websites to find out information. Can they go on the school website? They could go on a school website. I'm not sure that those have individual information about students, typically. Personal information that would be of the sort you get with a social networking website, which is whether someone, whether a child likes puppies or whether their parents have recently been through a divorce. That kind of information can't be gathered from a school website. And again, there are ample alternative channels here. These offenders can go on non-commercial social networking websites. They can go on social networking websites which only allow adults. They can go to news sites. They can use blogs, podcasts, those sorts of things. So there are other ways. And, in fact, most of there are plenty of people who don't use these kinds of websites and find out their information just fine. So it's not a matter of a necessity to have this sort of a website that you can go to. Kagan, how many people under 30 do you think don't use these sites to get all their information, under 35? I mean, they're increasingly, this is the way people get everything that, all information. And this is the way people structure their civic community life. They do get a lot of information. Obviously, most anything you can get there, you can get somewhere else. The news is typically not coming from Facebook. It's coming from some other website if they're getting news there. There are other ways that people can communicate other than through Facebook. And certainly, when you have social networking websites like Facebook, MySpace, Instagram that say, as a sex offender, we don't want you here, you can't come here. Obviously, there are ways those people can get their information. They don't have to use that to get that information. What about the, there was a brief by the Electronic Frontier, and even if the New York Times is not included, the point is that these people are being cut off from a very large part of the marketplace of ideas. And the First Amendment includes not only the right to speak, but the right to receive information. I mean, you don't question that they are being cut off from a large part. They are being cut off, and again, it has to be remembered that these are sex offenders who have been convicted of sex offenses. And they should be cut off from sources of information that they can use to perpetuate their crimes against children. And so, they are being cut off from these particular websites, but they have other means in which they can gather news, that they can communicate with friends, that they can share pictures. Those kinds of things can be done in other places. I do think it's important to make it clear that the statute does not include NewYorkTimes.com. And, of course- I've got a page here printed from the New York Times, where on the side, there's commentary by people who have created profiles on themselves, having a public discussion between them on a news article that was printed in the New York Times. That appears to be a new feature of the New York Times, but it appears to be a common feature of most newspapers today that are printed online. They often do allow commenting, but the requirement in the statute is that they allow someone to go to a profile page, and on that profile page, then link to people that they don't know. Where is that in the statute? Because I don't read the statute to impose that as a requirement. So, tell me where you find that. Certainly. That is in B-3 of the statute. So, B sets out the four broad requirements, four requirements to define a commercial social networking website. Right, so B-3- B-3- It allows users to create web pages or personal profiles that contain information such as links to other personal web pages. So, you're reading the such as as a requirement, but such as is not a requirement. Such as is just like, here's an example, but you don't necessarily need this. The other way that it can be read, and the narrower way, would be if you had an implied colon after the word contain. So that it read, allows users to create websites or personal profiles that contain, colon. And then four different things. One, information such as the name or nickname of the user. Two, photographs placed on the personal web page. Well, then you need an implied colon and an implied semicolon. Well, semicolons. And then another implied semicolon. And then another implied semicolon. Well, semicolons would be better, but they certainly would be better. I would use a semicolon. All this implying of punctuation marks. I mean, if you just read this, it's contain information such as a bunch of things, which none of which are necessary. But these are good examples of things that characterize allowing users to create web pages or personal profiles that contain information. That's your requirement. It really makes no sense not to have all four of those. Because that would mean that you could have the fourth one, links, but not the first one, the name of the person. Alito, you might read this to you might read a personal profile to mean something more than just a nickname. A personal profile, the definition of a profile is a concise biographical sketch, which seems to be or seems to refer to enough information so that you can get an idea about who the person is. Why don't you read it that way? And if you read it that way, would it include New York Times.com? No. That still would not include New York Times.com, because, well, our position still is that it has to have links. So I'm not sure I'm answering your question exactly as I should. Alito, I'm saying suppose we think that that's a stretch to get to links, but it does require a personal profile, and I wouldn't think that just a nickname. Somebody says my nickname is, I don't know what, Joe, that that's a profile? No. That would not be a profile. The other point is so would a name and a picture be a profile? And your ability to discuss in that comment section personal information or public information, whatever you want to discuss. Not under our reading of the statute. It still would require all four of these. And one other point about that is in subsection B4, there's a list that starts with such as and includes the word or, whereas in number 3, it has such as, but it has the word and. So the legislature certainly knew how to say or or and in those portions. But such as does not mean each of. Your reading that is, though, such as means each of. No, we're reading it as such as only modifies the name or nickname of the user. And then you have three other elements to it. So there could be things in. You can finish your sentence. In this instance, the co- not a co-defendant, but the other person charged here in this case that's not before the court used initials. So there could be something besides a name or a nickname. Robertson, Thank you, Mr. Montgomery. Mr. Goldberg, you have four minutes remaining. Goldberg, Thank you, Your Honor. I'll try and make four points. As to the New York Times, our main submission is it doesn't matter, but that said because it is overbroad as applied to any one site, but that reading of the statute doesn't work grammatically. If you look in the A and in the B, it talks about sites that create web pages or personal profiles, and in A it says to become members or create personal web pages. So you can't have a links requirement if there are sites that are — that qualify without creating web pages. Second, when they told Mr. Packingham what this law requires and what this means, they didn't say anything about links. If you look at the State Supreme Court opinion, they assumed, and not just for decisional purposes, they said to the extent that the Petitioner is right, there are alternatives, so they didn't embrace this construction. And just recently, on this question of Snapchat, after the State filed the brief, which was all about links, they prosecuted somebody for using Snapchat, which is a site that doesn't have links of the kind that we're talking about. So that construction, and as my friend is saying, maybe somebody might understand what profile means, but this is a criminal statute, and I think if any of us were advising somebody on the registry whether they can do it, the plain language, the history, the Supreme Court opinion all say you're in great danger of liability here. Steer clear, and that's what the officer, in this case, when he was cross-examined on that question, that's what he said. The second thing about alternative channels, this is there is the President. There are also 500 million tweets a day. There are 10 billion Snapchat videos. It's not just people under 30. Alitoson I suppose that this case had come to us in 2003, before Facebook was created. Would there be alternative channels then? Stewart In 2003, I'm not quite sure what the – in 2003, the predominant area was chat rooms, and that's explicitly exempted. So I'm not sure what that – what they would be going after. I think on the question of – so there were people in Ladue who did not have lawn signs, but there are more than 3 billion people in the world who are using these sites, a very small percentage of people. Alitoson But what I'm asking is whether the existence of alternative channels asks whether these are channels that people like to use, or whether if the channels that are affected by the statute are taken away, there are still alternative channels. I mean, I know there are people who think that life is not possible without Twitter and Facebook and these things, and that 2003 was the dark ages. But I don't know that any channels of communication that were available at that time had been taken away. So if there were alternative channels then, why would there not be alternative channels now? Well, I think, Your Honor, you have to look at it – this was passed in 2008 – and you have to look at it in practical terms about what people's communicative life is and what they're able to do. And if you look at the cases that have enforced those – that requirement, if you look at Lindmark, you look at City of Ladue, are the two cases that have struck down laws even in the context of adult zoning, the Court has said, that there has to be a substantial amount of access and protected speech. In the Los Angeles Airport case, that was one place. These are the places where everybody is speaking and interacting and looking for work and petitioning the government. Every single representative, there are political debates. The President is speaking to the people through this medium. So it is an extraordinary argument to say, not everybody does it. I don't think that's the test. The test is how much of your core First Amendment activities foreclosed, and the ability to speak with this networked group of people all over the world is as strong – this is, as Justice Kennedy said, well beyond the traditional town square. And I'm sure there were people who didn't go to the town square, but that wouldn't be a basis for upholding a restriction there. The core point here, though, is that Mr. Packingham, this law reaches speech that is fundamentally at the core – I'm sorry, Your Honor. Roberts. You can finish that sentence. I'll just say this case, this wolf comes as a wolf. This is core protected speech. There is nothing about it that implicates the government's purpose. And the fact that he was convicted for a felony is why this law is unconstitutional. Thank you, Your Honor. Thank you, counsel. The case is submitted.